IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


-------------------------------------------------------  .
SEAN WALSH, et. al.                                    : CASE NO.    1:05 CV 00769
                                                       :
                              Plaintiffs,              :
                                                       : MEMORANDUM OF OPINION AND
              -vs-                                     : ORDER GRANTING DEFENDANT AT&T
                                                       : CORP.'S MOTION FOR SUMMARY
AT&T CORP.,                                            : JUDGMENT
                                                       :
                              Defendant.               :
-------------------------------------------------------


UNITED STATES DISTRICT JUDGE LESLEY WELLS


        The defendant in this wrongful termination of employment dispute, AT&T Corporation

("AT&T"), moves for summary judgement against plaintiff Sean Walsh's ("Mr. Walsh") claims.

(Doc. 38).  Mr. Walsh maintains his action for: (1) disability discrimination under the Americans

with Disabilities Act ("ADA") 42 U.S.C. § 12201; (2) violation of the Family Medical Leave

Act ("FMLA"); (3) wrongful discharge in violation of public policy; (4) intentional of infliction

of emotional distress; (5) punitive damages; and, (6) Mr. Walsh's minor son plaintiff Quinn

Walsh's claim for loss of consortium.  Mr. Walsh has filed an opposition to the motion for

summary judgment (Doc. 40) and AT&T has filed a reply (Doc. 42 ).  This Court has jurisdiction

under 28 U.S.C. § 1331.

## I. Overview and Facts.

Mr. Walsh claims to have suffered from ulcerative colitis since 1991.  Ulcerative colitis is a chronic inflammatory bowel disease of the large intestine.[1]  From 1998 until 2001, Mr. Walsh's ulcerative colitis was in remission.  (Doc. 38, p.19).  During this time period, Mr. Walsh secured an employment-at-will position with AT&T as a sales executive selling Web Hosting products and services to medium-sized businesses throughout northern Ohio.  (Doc. 38, Ex. 7). Corporate web hosts, such as the defendant, manage and maintain websites for other businesses. An integral part of the sales position requires "face-to-face" meetings with customers.  (Doc 38, Sean Walsh's deposition, p. 184).  Sales executives were thus required to drive throughout their assigned territories to generate business.  At the time of his hiring with AT&T, Mr. Walsh's territory covered medium-sized accounts in Northern Ohio.  For the remainder of the state, two other Web Hosting sales executives, based in Columbus, Ohio, covered all sizes of accounts.

The uncontested record shows that AT&T provided each sales executive with a quota which had to be met in order to avoid eventual termination.  Those quotas were calculated on the basis of the executive's sales "funnel:" a statistical device which  AT&T's managers use to predict potential sales.  A funnel lists potential customers and the dollar amount of anticipated business expected from each.  Every week, in a mandatory "funnel report," all sales executives stipulated to the amount of their funnel.  In early 2001, Mr. Walsh ranked second in sales at the

---

[1]The disease waxes and wanes over time, with acute flare-ups followed by periods of remission. During a severe flare-up, an individual with ulcerative colitis experiences painful abdominal cramping and frequent episodes of explosive, bloody diarrhea which often result in incontinence. Crohn's and Colitis Foundation of America, http://www.ccfa.org/info/about/ucp. During periods of remission, the individual remains almost completely aysmptomatic. While large doses of steroids during a severe flare-up can help to alleviate a sufferer's symptoms, there is no known cure for ulcerative colitis. Id.

national level. (Doc. 40, p.11).  Mr. Walsh  further received praise for his efforts in a quarterly review for 2001 and in his annual review summary for 2001.  Id.

However, Mr. Walsh's sales declined precipitously during the remainder of 2001. (Doc. 38, p.13).  Mr. Walsh's manager, John McCloud ("Mr. McCloud"), subsequently placed the plaintiff on a Performance Improvement Plan ("PIP") in February 2002.[2]  Id..

The evidence shows that AT&T used placement on a PIP as a warning to employees that their position was in jeopardy due to poor performance.  PIPs operate on two levels: A and B. An underperforming employee is initally placed on Level A PIP.  On that level, an employee normally has thirty days to improve his or her sales.  Managers may extend Level A for up to thirty days, at his or her discretion.  Failing improvement, the employee is placed on Level B PIP.  On that level, AT&T gives the employee the option of either conducting a thirty day "job search" with subsequent termination or choosing a thirty day extension of the PIP during which a manager may terminate an employee at any time for poor performance.  (Doc. 38, Ex. 7; Ex. 18). At the end of thirty days, if an employee's sales have not sufficiently improved, the employee is routinely terminated.  (Doc. 38, Deposition of Joseph Gibbons, p.151).  Placement on a PIP results in a twelve month probationary period after being removed from the plan.  Any failure to maintain the required sales quota during these twelve months can result in an employee's return to a Level A PIP. Id. at 125.  As part of defendant's corporate policy, individuals placed on a PIP prior to medical leave remain on probation upon their return.  Mr. McCloud removed Mr. Walsh from a Level A PIP in March 2002 because the plaintiff  made sufficient sales.  (Doc. 38, p.13).

---

[2] A single, large sale in early 2001 artificially skewed Mr. Walsh's overall sales performance for that year. (Doc. 42, McCloud Dep., p.46; Doc. 42, Walsh Dep., p.8). The record indicates that his placement on a PIP in February 2002 reflected a period of poor sales performance spanning much of 2001 and the beginning of 2002.

3

In April 2002, Mr. Walsh  returned to a PIP Level A due to lack of sales.  Exercising his discretion, Mr. McCloud granted the plaintiff a thirty day extension of his Level A PIP in May 2002.  Id.

According to the plaintiff, during Spring 2002, he experienced a sustained and severe flare-up of his ulcerative colitis.  In light of his deteriorating medical condition and on the advice of his physicians, Mr. Walsh began medical leave on or about 31 May 2002.  Mr. Walsh remained on medical leave until 3 September 2002.  Several weeks into his leave, Mr. Walsh inquired about the possibility of working for AT&T from home in an administrative capacity, but was told no such position was available.

During Mr. Walsh's medical leave, the two other Web Hosting sales executives based in Ohio either transferred out of state or left for employment elsewhere.  As of 15 July 2002, AT&T had no active sales representatives for Ohio.  (Doc. 38, p.14).  In response, Mr. McCloud advertised in Cleveland and Columbus, Ohio, for an open AT&T sales position and hired John Lyon ("Mr. Lyon"), of Cleveland, on 1 August 2001.  (Doc. 40, Ex. P).  During this time period, according to the record, AT&T changed its sales structure and began to allot Ohio sales accounts solely by geographic territory as opposed to its previous policy of alloting accounts by both territory and account size.  (Doc. 38, p.15).  As a result, each sales executive held responsibility for generating sales throughout his or her particular territory regardless of account size.

The record indicates that, upon Mr. Walsh's return from medical leave on 3 September 2002, Mr. McCloud charged him and Mr. Lyon with devising a plan to divide Ohio into roughly equal sales territories.  Testimony shows that Mr. Walsh  complained to Mr. McCloud about this turn of events and requested that his identical territory and accounts be returned to him.  Mr.

4

McCloud refused. Mr. Lyon meanwhile devised a plan that gave him the Cincinnati, Ohio and Dayton, Ohio markets as well as half of the Cleveland market.  (Doc. 38, Deposition of John Lyon, p.17, 29-32).  The plan left Mr. Walsh  with the Columbus, Ohio market and half of the Cleveland market.  (Doc. 38, Ex. 16).  On 11 September 2002, Mr. Lyon simultaneously emailed the plan to both Mr. McCloud and Mr. Walsh. (Doc. 38, Ex. 17).  Mr. Walsh did not  respond to the email and the plan subsequently went into effect in October 2002.  (Doc. 38, p.15).

An essential part of the new plan required Mr. Walsh  to travel regularly to Columbus. By October 2002, Mr. Walsh claims that he was feeling well enough a "majority of the time" to engage in such frequent travel.  (Doc. 38, Walsh Depo., p.96).  At this time, his treating physician also certified that Mr. Walsh's ulcerative colitis was "in remission."  (Doc 38, Deposition of Dr. Jeffry Katz, p.44).

On 15 October 2002, Joseph F. Gibbons ("Mr. Gibbons") replaced Mr. McCloud as sales manager for Ohio. (Doc. 40, p.14).  On 15 November 2002, some ten weeks after Mr. Walsh's return, Mr. Gibbons re-activated Mr. Walsh's Level A PIP due to poor sales performance. (Although not completely clear from the record, technically Mr. Walsh continued to be on a Level A PIP when he returned to work on 3 September 2002.  AT&T did not actively enforce Mr. Walsh's PIP until 15 November 2002, approximately ten weeks after his return.)  Based primarily upon the size of Mr. Walsh 's sales funnel, Mr. Gibbons also raised Mr. Walsh's sales quota beyond what it had been previously. (Doc. 38, Gibbons Depo.,  pp.142-43).  Mr. Gibbons granted Mr. Walsh  a two week extension at Level A status due to the holidays.  On or about 8 January 2003, Mr. Gibbons moved Mr. Walsh to Level B status. Mr. Walsh  chose to remain on a Level B PIP instead of pursuing a job search.  Due to a continuing lack of sales, Gibbons

5

terminated Mr. Walsh on 10 February 2003. Subsequently, Mr. Gibbons also terminated Mr. Lyon, the other Ohio sales executive, for poor sales on 15 July 2003, after having placed him on a PIP. Id. at 161.

On 8 February 2005, Mr. Walsh filed the present action in the Cuyahoga County Court of Common Pleas and AT&T removed the case to the Northern District of Ohio on 21 March 2005.

## II. Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. At 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991) (moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial" (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd.

6

61 F.3d 1241, 1245 (6th Cir. 1995).  Read together, <u>Liberty Lobby</u> and <u>Celotex</u> stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50.  <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1478 (6th Cir. 1989).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).  Once the burden of production has shifted, however, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 574, 586 (1986); <u>see</u> <u>also</u> <u>Michigan Protection and Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994) (marking as standard that the plaintiff must present "more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff").  Rather, rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position.  <u>Celotex Corp.</u>, 477 U.S. at 324.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment shall be denied "[i]f there are...genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party."  Hancock v. Dodson, 958 F.32d 1367, 1374 (6th Cir. 1992) (citation omitted).

### III. Mr. Walsh's Claim Pursuant to the Americans with Disabilities Act

To avoid summary judgment on his disability discrimination claim[3], pursuant to the ADA, Mr. Walsh must show a genuine question of material fact as to whether he (1)  has a disability; (2) was qualified for the job; and (3) was denied a reasonable accommodation or subject to an adverse employment decision because of his disability.  Roush v. Weastec, Inc., 96 F.3d 840, 842 (6th Cir. 1996).  If Mr. Walsh successfully establishes his prima facie case, then the burden of production shifts to AT&T to provide "a legitimate, non-discriminatory reason for its employment action."  Brown, 305 F. Supp. at 823 (citing  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1185 (6th Cir. 1996)).

If AT&T provides such a reason, then the burden shifts back to Mr. Walsh to show that AT&T's "articulated reason is a pretext for unlawful discrimination."  Monette, 90 F.3d at 1185-86.  Importantly, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  Pursuant to the parties' briefs, only the first and third elements of Mr. Walsh's prima facie case are at issue.

---

[3]In the instant case, because the "essential elements under the ADA and Ohio law are the same, the Court will examine the Plaintiff's state and federal claims together."  Brown v. BKW Drywall Supply, Inc., 305 F. Supp. 2d 814, 822 (S.D. Ohio 2004).

As part of his burden to survive summary judgment, Mr. Walsh must first show that he has a disability.  The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." § 12102 (2) (A). Digestive disorders, such as ulcerative colitis, <u>may</u> count as a "physical...impairment." C.F.R. 1630.2(h)(1).  "Major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  <u>Id.</u> at (i). Lastly, "substantially limited" means

> <u>significantly restricted</u> as to the condition, manner or <u>duration</u> under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

<u>Id.</u> at (j)(ii) (emphasis added).  Alternatively, the ADA also allows for "being <u>regarded</u> as having such [a physical or mental] impairment" to count as a bona fide disability. § 12102 (2) (C) (empahsis added).

In the Sixth Circuit,  to qualify as a disability under the ADA, an impairment must "limit an individual, not in a trivial or even moderate manner, but in a major way."  <u>Gonzales v. Nat'l Bd. of Med. Exam'rs</u>, 225 F.3d 620, 627 n.12 (6th Cir. 2000).  Succinctly,  "impairments which merely affect major life activities" must be distinguished "from those that substantially limit those activities."  <u>Brown,</u> 305 F. Supp. 2d at 824 (citing  <u>Ryan v. Grae and Ribicki, P.C.</u>, 135 F.3d 867, 870 (2d Cir. 1998)).  Chronic diseases which tend to wax and wane over time require an investigation into their durational extent to determine whether the particular disease substantially limits the afflicted individual.  Courts are reluctant to find a substantial limitation in cases where long periods of asymptomatic remission are only infrequently interrupted by a

9

severe flare-up: "short-term, temporary restrictions are not substantially limiting." <u>Roush</u>, 96 F.3d at 843 (citing <u>Hamm v. Runyon</u>, 51 F.3d 721, 725 (7th Cir. 1995)).

In the instant case, Mr. Walsh's ulcerative colitis, while both chronic and on one occasion severely debilitating, exhibits neither "sufficient frequency" nor  "sufficient duration" to count as a disability under the ADA.  <u>Brown,</u> 305 F. Supp. 2d at 826.  As the record indicates, Mr. Walsh's ulcerative colitis only prevented him from working for an extended period on one occasion, from 28 May 2002 to 3 September 2002. (Doc. 42, pp.2-3).  From 1998 to late 2001, Mr. Walsh's ulcerative colitis was in complete remission.  Dr. Katz, Mr. Walsh's treating physician, testified that Mr. Walsh's disease was again in remission from early October 2002 to the date of his deposition.  (Doc. 38, Deposition of Dr. Jeffry Katz, p.44).  In his own deposition testimony, Mr. Walsh has repeatedly asserted that his disease rarely interfered with his ability to work.  (Doc. 38, Walsh Depo., p.18; 31-23).  He further attested: "I think I live normal." <u>Id.</u> at 48.  Mr. Walsh also noted that his disease did not even prevent him from engaging in extensive travel a "majority of the time." <u>Id.</u> at 30.  Lastly, since securing a position with SBC in 2004, Mr. Walsh has apparently not missed a single day of work due to his ulcerative colitis. <u>Id</u>. at 48.

Mr. Walsh, by his own admission, has often foregone medical assistance for his condition for several years at a time.  Even though Mr. Walsh's "colitis is a permanent affliction, the fact that it is asymptomatic for long periods, and varies in intensity, weighs against a finding of substantial limitation." <u>Ryan</u>, 135 F.3d  at 871 .  Mr. Walsh's disease simply does not "significantly restrict" his ability to work within the meaning of the ADA "as compared to...the average person in the general population."  C.F.R. 1630.2 (j)(ii).

Alternatively, Mr. Walsh claims that AT&T "regarded" him as disabled.  The record indicates, however, that Mr. Walsh's superiors believed him to be suffering from an extended episode of "super diarrhea" and an "intestinal problem" from which he would recover and return to work fully capable of handling his professional responsibilities.  (Doc. 42, Deposition of Joseph Gibbons, p.112; Doc. 42, McCloud Dep., p.152).  Upon seeing Mr. Walsh some weeks after his return from medical leave, his manager, Mr. Gibbons, testified that Mr. Walsh "appeared lucid, appeared relaxed...he was comfortable."  Further, before reactivating Mr. Walsh's Level A PIP, Mr. Gibbons asked Mr. Walsh whether he was "back hundred percent" (sic) to which the plaintiff replied in the affirmative (Doc. 40, Gibbons Depo., p.119).  The uncontroverted evidence indicates that Mr. Walsh's managers regarded him as an individual with "all of the potential" to be an outstanding sales person who, at most, suffered from a lack of motivation. (Doc. 42, McCloud Dep., p.13).  Further, in his deposition testimony, Mr. Walsh admitted he viewed himself as healthy enough to cover his expanded  territory "the majority of the time."  (Doc. 38, Walsh Depo., p.96).  Nothing in the record would thus allow for a reasonable jury to find for Mr. Walsh on this claim.  See Cotter v. Ajilon Servs., 287 F.3d 593, 599-600 (6th Cir. 2002) (an employer does not necessarily regard an employee as disabled simply because the employee cannot meet the demands of a particular job).  Mr. Walsh thus fails to satisfy the first element of his prima facie case.

Relative to the third element of his prima facie case, Mr. Walsh, in the alternative, contends that he was denied a reasonable accommodation or subject to an adverse employment decision because of his disease.  In September 2003 and upon return from his extended absence, Mr. Walsh requested that AT&T accommodate his disease by not requiring him to drive to

Columbus.  (Doc. 38, Walsh Depo., p.119-20).  (In his testimony, however, Mr. Walsh's manager, Mr. Gibbons, does not recall Mr. Walsh making any reference to "his condition" when making such a request.  Doc. 40, Gibbons Depo., p.119)).

In appropriate circumstances, the ADA mandates "job restructuring" as a "reasonable accommodation." See 42 U.S.C. § 12111(9)(B).  Within the meaning of the ADA, however, "job restructuring" only applies to the "non-essential duties or marginal functions of a job." Bratten v. SSI Servs., Inc., 185 F.3d 625, 632 (6th Cir. 1999) (citing Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112-13 (8th Cir. 1995)).  Mr. Walsh's proposed accommodation undermined an "essential function[] of the job" and therefore was not reasonable under the ADA.

During Mr. Walsh's absence, AT&T reduced its sales force in Ohio and re-organized sales territory based solely on geography as opposed to account size.  As the uncontroverted record indicates, an essential function of any AT&T sales executive is to devote a great deal of "windshield time" to driving around the state to meet with existing and potential clients. (Doc 42, Gibbons Depo., p.76).  The ADA does not require AT&T to re-structure the essential duties attendant with Mr. Walsh's position. Nor does the ADA require AT&T to assign Mr. Walsh's duties to his colleagues: "employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability." Bratten, 185 F.3d at 632 (citing Cochrum v. Old Ben Coal Co., 102 F.3d 908, 913 (7th Cir. 1996)).  Moreover, in his deposition testimony, Mr. Walsh admitted he could handle his geographically expanded territory "the majority of the time," thereby eliminating the need for a reasonable accommodation. (Doc. 38, Walsh Depo., p.96).

12

In the alternative, Mr. Walsh maintains he was subject to an adverse employment decision "because of" his disease.  In support of this claim, Mr. Walsh points to a constellation of events, from his placement on a PIP to his eventual termination, which purportedly "raise a fact question" as to  whether AT&T terminated Mr. Walsh "because of" his ulcerative colitis. (Doc. 40, p.21).

The record indicates, however, AT&T placed Mr. Walsh on a PIP Level A in February 2002, and subsequently removed him in March 2002 only to return him to a PIP Level A in April 2002.  The testimony shows that AT&T's PIP actions with regard to Mr. Walsh's substandard job performance preceded the plaintiff's medical leave.  Further,  AT&T provided Mr. Walsh with extensions of a PIP Level A on 5 May 2002 and 15 December 2002. (Doc 38, Ex. 5, p.2; Walsh Depo., p.65).  Contrary to company policy, which requires that an employee return from medical leave on the same probationary status, AT&T did not reactivate Mr. Walsh's April 2002 PIP Level A status until 15 November 2002, some ten weeks after his return. (Doc 38, Ex. 5, p.2)

Further, Mr. Walsh's claim that AT&T "replaced him while on leave" has no basis in the record. (Doc. 40, p.21).  The record testimony indicates that lacking any active Web Hosting executives in Ohio, AT&T advertised for a position in both Columbus and Cleveland. (Doc. 38, Ex. 14).  AT&T subsequently hired Mr. Lyon, of Cleveland, to cover not only half of Northeast Ohio but also the Dayton and Cincinnati markets.  Mr. Lyon thus did not "replace" Mr. Walsh. As such, Mr. Walsh also fails to prove the third element of his prima facie case.

13

**IV. Mr. Walsh's Claim that AT&T Relied on a Pretextual Reason to Terminate Him**

In the Sixth Circuit, to raise a question of material fact with regards to a defendant's proffered legitimate, non-discriminatory reason for an adverse employment action, the plaintiff must show that the proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to motivate the action. <u>Kocsis v. Multi-Care Mgmt.,</u> 97 F.3d 876, 883 (6th Cir. 1996).

In the instant case, even assuming Mr. Walsh had discharged his <u>prima</u> <u>facie</u> burden, his ADA claim would also fail because he does not establish that AT&T's proffered, legitimate, non-discriminatory reason for termination is pretextual.  AT&T maintains it terminated Mr. Walsh for insufficient sales.  The uncontested record evidence indicates that Mr. Walsh was below quota before his absence, and made only a few sales after returning to work in early September 2002.

The documents before the court show that Mr. Walsh was warned of possible termination due to lack of sales, both prior to his departure and following his return.  (Doc 38, Ex. 5).  The documents also show that AT&T subsequently terminated Mr. Walsh's colleague, and the only other Ohio salesperson, for sustained poor sales.  ((Doc. 38, Gibbons Depo.,  pp.142-43).  Finally, the uncontested evidence shows that following his return, Mr. Walsh's managers, at their discretion, extended the time that Mr. Walsh was allowed to remain on PIP Level A.   Mr. Walsh thus fails to meet his burden of production.[4]

---

[4]Likewise, Mr. Walsh's claims for punitive damages under both the ADA and  O.R.C. § 4112 fail because he did not establish a <u>prima</u> <u>facie</u> case under either Act. Specifically, "to support a claim for punitive damages, the plaintiff must show that the employer 'engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" <u>Workman v. Frito-Lay, Inc.,</u> 165 F.3d 460, 469 (6th Cir. 1999) (quoting 42 U.S.C. § 1981a(b)(1)).

**V. Mr. Walsh's Claim that his Termination Violated the Family Medical Leave Act**

As a preliminary matter, AT&T claims that the statute of limitations has run on Mr.

Walsh's FMLA claim.  The FMLA provides for a two-year window, dating from the last adverse

action in violation of the Act, within which a plaintiff may bring a cause of action.  <u>See</u> 29

U.S.C. § 2617(c) (extending the statute of limitations to three years if the plaintiff can prove that

the violation was "willful").  Normally, the "last adverse action" occurs on the date of the

plaintiff's termination.  <u>See Butler v. Owens-Brockway Plastic Prods., Inc.</u>, 199 F.3d 314 (6th

Cir. 1999).  In the instant case, AT&T terminated Mr. Walsh on 10 February 2003 and Mr.

Walsh commenced this action on 8 February 2005.  The Act's statute of limitations, thus, does

not bar Mr. Walsh's cause of action.

The FMLA permits an eligible employee to take up to twelve weeks of leave during any

twelve-month period if the employee has a "serious heath condition that makes the employee

unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

Under the FMLA, a "serious health condition" is "an illness, injury, impairment, or physical or

mental condition that involves...continuing treatment by a health care provider."  <u>Id.</u> at

§ 2611(11).  The statute requires an employee to notify his or her employer that qualifying

medical leave is necessary <u>Hoge v. Honda of America Mfg., Inc.</u>, 384 F.3d 238, 243-44 (6th Cir.

2004) (citing <u>Arban v. West Publ'g Corp.</u> 345 F.3d 390, 400 (6th Cir. 2003)).

The Sixth Circuit recognizes  two theories for recovery under the FMLA: (1) the

"entitlement" or "interference" theory arising from 29 U.S.C. § 2615(a)(1); and (2) the

"retaliation" or "discrimination" theory arising from 29 U.S.C. § 2615(a)(2).  The FMLA creates

both "prescriptive and proscriptive employee rights.'"  <u>Hoge,</u> 384 F.3d at 244 (citing <u>Taylor v.</u>

Union Inst., 30 Fed. Appx. 443, 2002 WL 252443, *7 (6th Cir. 2002) (unpublished opinion))

(quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998)).

Under the "interference" theory, the Act provides for prescriptive rights which both "set[]

substantive floors" for conduct by employers and create "entitlements" for employees.  Taylor,

30 Fed. Appx at 452.  The Act specifically provides that "it shall be unlawful for any employer

to interfere with, restrain, or deny the exercise of or  the attempt to exercise, any right provided

in this subchapter."  § 2615(a)(1).  To prevail on the interference theory, "the plaintiff need not

show that he was treated worse than other employees, just that he [or she] was denied an

entitlement under the Act."  Hoge, 384 F.3d at 244 (citing Taylor, 30 Fed. Appx. at 452).

Employers may violate § 2615(a)(1) regardless of the intent behind their conduct. Id. (citing

Arban, 345 F.3d at 401; Hodgens, 144 F.3d at 159).  To succeed on an interference claim, the

plaintiff must establish that: (1) he was an eligible employee; (2) his employer is covered under

the Act; (3) he was entitled to leave under the Act; (4) he gave his employer notice of his intent

to take leave; and (5) his employer denied his FMLA benefits or interfered with FMLA rights to

which he was entitled. Id. at 244.

Here, the record indicates that Mr. Walsh satisfies the first four elements of his prima

facie case. Mr. Walsh was eligible for FMLA leave, the FMLA covered AT&T, Mr. Walsh, due

to his colitis, was entitled to take leave, and, Mr. Walsh gave AT&T due notice thereof.

In regards to the fifth element, Mr. Walsh contends that AT&T interfered with his FMLA

right "to be restored to an equivalent position with equivalent employment benefits, pay, and

other terms and conditions of employment." § 2614(a)(1)(B).  Specifically, Mr. Walsh argues

that by expanding his territory and making him responsible for all account sizes, AT&T provided

16

him with a substantially different employment position upon his return from medical leave. AT&T argues that it restored Mr. Walsh to a Web hosting sales position with the same pay and benefits, at which he continued to work for several months until his eventual termination due to sustained poor sales performance.  Further, AT&T contends that during Mr. Walsh's extended absence it was forced to re-structure its Ohio operations as its other two Ohio salesmen either transferred or resigned (Doc 38, Ex. 16).

Congress designed the FMLA to balance the medical needs of employees with the business needs of employers.  Sixth Circuit courts consistently recognize that "the 'equivalent position' provision under § 2614(a)(1)(B) recognizes the dynamic needs of employers and permits them to restore employees to positions other than the exact one they left."  Hoge, 384 F.3d at 249.  Importantly, the restructuring at issue did not officially occur until after Mr. Walsh's return from medical leave on 3 September 2002.  During Mr. Walsh's absence, AT&T had reduced its Ohio sales force from three individuals to two (including Mr. Walsh).  On 11 September 2002, Mr. Gibbons charged Mr. Walsh and Mr. Lyon with devising a new way for dividing up AT&T's Ohio sales territory.

Paradigm interference claims require that the illegitimate re-structuring occur while the employee is on leave, not after he has returned.  See, e.g., Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 313 (6th Cir. 2001) (employee discharged prior to taking scheduled FMLA leave due to corporate restructuring).  Further, and as exemplified in the C.F.R, "If a shift has been eliminated [during an employee's absence], or overtime has been decreased, an employee would not be entitled to return to work that shift or the original overtime hours upon restoration." § 825.216 (a) (2).  Likewise, during Mr. Walsh's absence, AT&T reduced its Ohio Web Hosting

17

sales personnel from three individuals to two (including Mr. Walsh).  This reduction in force necessitated a change in Mr. Walsh's job responsibilities subsequent to his return.  Mr. Walsh thus fails to satisfy the <u>prima facie</u> case for his interference claim.

Under the "discrimination" theory, the FMLA creates proscriptive rights which "prohibit disparate employer conduct with regard to employees taking leave."  <u>Taylor,</u> 30 Fed. Appx. at 452.  At § 2615(a)(2), the Act provides that "it shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  Unlike an FMLA interference claim, employer intent is an integral component of a discrimination claim.  "What makes the employment decision unlawful under the [discrimination] theory is the motive of the employer--namely, that the action was taken because the employee exercised, or complained about the denial of, FMLA-protected rights." <u>Edgar v. JAC Prods.,</u> 443 F.3d 501, 512 (6th Cir. 2006).

To succeed on a discrimination claim, the plaintiff must establish that: (1) he or she engaged in an FMLA protected activity; (2) the exercise of his or her rights under the FMLA was known to his employer; (3) the employer thereafter committed an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  <u>Canitia v. Yellow Freight System, Inc.,</u> 903 F.2d 1064, 1066 (6th Cir.1990).  Once a plaintiff establishes the  <u>prima facie</u> discrimination claim the discrimination theory further relies on the burden-shifting framework utilized above in connection with Mr. Walsh's ADA claim.

Here, the record indicates that Mr. Walsh satisfies the first three elements of his <u>prima facie</u> case.  Mr. Walsh's extended leave due to colitis counts as a protected activity under the

18

FMLA. AT&T was aware that Mr. Walsh was exercising his rights under the FMLA. AT&T terminated Mr. Walsh several months after his return from leave.

With regard to the fourth element, however, nothing in the record indicates that AT&T terminated Mr. Walsh <u>because</u> he took FMLA-protected leave. Importantly, Mr. Walsh remained at his position for several months following his return from leave. The evidence shows that AT&T did not re-activate his PIP Level A status upon his return from FMLA leave, as company policy would dictate, since he was on a PIP Level A immediately prior to his departure. (Doc. 38, Ex. 5).

In paradigm <u>prima facie</u> cases of discrimination, however, termination occurs during, or upon immediate return from, protected leave where the causal nexus is established between the adverse employment action and the exercise of a protected leave. See <u>Canitia</u>, 903 F.2d at 1066. The record does not establish that AT&T desired to retaliate against Mr. Walsh for taking FMLA leave. <u>Id.</u> <u>See also</u> <u>Edgar</u>, 443 F.3d at 512. The requisite causal connection between the protected activity and the adverse employment action is simply missing. On the discrimination claim, Mr. Walsh thus fails to establish his <u>prima facie</u> case.

**VI. Mr. Walsh's Claim for Wrongful Discharge in Violation of Public Policy**

In Ohio, four elements comprise the tort of wrongful discharge in violation of public policy: (1) "That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the <u>clarity</u> element);" (2). "That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the <u>jeopardy</u> element);" (3) "The plaintiff's

19

dismissal was motivated by conduct related to the public policy (the <u>causation</u> element);" and (4) "The employer lacked overriding legitimate business justification for the dismissal (the <u>overriding justification</u> element)." <u>Collins v. Rizkana</u>, 73 Ohio St. 3d 65, 69-70 (Ohio 1995) (quoting H. Perritt, <u>The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?</u> (1989), 58 U.Cin.L.Rev. 397, 398-399) (Original Emphasis.).

In the instant case, AT&T does not contest the clarity element.  AT&T argues that Mr. Walsh fails to establish the jeopardy element because O.R.C. § 4112 and the FMLA already provide adequate remedies should a violation have occurred. (Doc 38, p.28).  Mr. Walsh responds that, at most, Ohio law only precludes him from moving forward with his wrongful discharge in violation of public policy claim if he were <u>only</u> relying on his FMLA claim and not also relying on his claims under the ADA and  O.R.C. § 4112.02.

Under Ohio law, "there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests." <u>Wiles v. Medina Auto Parts</u>, 96 Ohio St. 3d 240, 244 (Ohio 2002).  Since the ADA, the FMLA and O.R.C. § 4112 all afford Mr. Walsh adequate rights and remedies, he fails to satisfy the jeopardy element.  Mr. Walsh's success at satisfying the causation element turns on whether his federal and state employment discrimination claims and FMLA claim survive summary judgment.  As noted above, neither set of claims survives and thus Mr. Walsh fails to meet the causation element.  Mr. Walsh also fails to satisfy the overriding justification element: sustained poor sales performance, as the record extensively indicates, counts as a "legitimate business justification" for termination.  As such, Mr. Walsh does not establish his <u>prima facie</u> case for wrongful discharge in violation of public policy.

**VII. Mr. Walsh's Claim for Intentional Infliction of Emotional Distress**

Under Ohio law, to succeed on a claim of intentional infliction of emotional distress the plaintiff must prove the defendant: (1) either intended to cause the plaintiff emotional distress or should have known that his or her conduct would cause the plaintiff emotional distress, Uebelacker v. Cincom Systems, Inc., 48 Ohio App. 3d 268, 275 (Ohio Ct. App. 1988); (2) undertook actions "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly  intolerable in a civilized community," Id. at 275-76 (citing  Restatement of the Law 2d, Torts (1965) 73, Section 46, Comment d); and, (3) proximately caused  the plaintiff's "psychic injury."  Id. at 276. Further, the resultant emotional distress must be so serious that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." Id. (quoting  Paugh v. Hanks, 6 Ohio St. 3d 72, 451 N.E. 2d 759 (Ohio 1983)).

Here, the record indicates Mr. Walsh has satisfied none of the elements of his prima facie case for the intentional infliction of emotional distress.  The record indicates neither that AT&T intended to cause Mr. Walsh any emotional distress nor that AT&T's conduct in dealing with Mr. Walsh was "utterly intolerable in a civilized community."  Further, nothing in the record indicates that AT&T was the proximate cause of any emotional distress which Mr. Walsh might have suffered.  Beyond his own deposition testimony, Mr. Walsh provides neither expert nor lay witnesses who could attest to the allegedly negative emotional impact of  AT&T's conduct on Mr. Walsh.  See Conway v. International Ass'n of Heat and Frost Insulators and Asbestos, 209 F. Supp. 3d 731, 761-62 (N.D. Ohio 2002) (citing Uebelacker, 549 N.E. 2d at 1220).  Lastly, any emotional distress indicated in the record does not rise to the "severe and debilitating" level of

seriousness required by the Paugh court. Paugh, 6 Ohio St. 3d at 78, 451 N.E. 2d at 765.  For the reasons stated above, this Court finds that Mr. Walsh has failed to establish that he was removed from his position on pretextual grounds.  Therefore, Mr. Walsh's removal cannot provide a basis for recovery for intentional infliction of emotional distress.

**VIII. Quinn Walsh's Claim for Loss of Parental Consortium.**

Mr. Walsh's minor son, Quinn Walsh, joins him in this action as a plaintiff claiming loss of parental consortium.  Under Ohio law, a loss of parental consortium claim is a "derivative action against a third-party tortfeasor." Gallimore v. Children's Hosp. Med. Center, 67 Ohio St. 3d 244, 251, 617 N.E.2d 1052 (Ohio 1993).  The success of such a claim is predicated upon the defendant's having committed a  "legally cognizable tort"  against the adult plaintiff(s). Derungs v. Wal-Mart Stores, 162 F. Supp. 2d 861, 872 (S.D. Ohio 2001) aff'd, 2004 U.S. App. LEXIS 13439 (6th Cir. 2004).  In the instant case, Mr. Walsh has failed to establish that AT&T committed a legally cognizable tort against him.  Therefore, as a matter of law, Quinn Walsh cannot raise a loss of parental consortium claim against AT&T.

**IX. Conclusion**

For the reasons set forth above, this Court dismisses all of Mr. Walsh's federal and state statutory and common law claims against defendant AT&T Corporation.

IT IS SO ORDERED

Date:  11 July 2007                                    _____/s/ Lesley Wells_____
                                                                        UNITED STATES DISTRICT JUDGE